# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

FATEEN ROHN MUHAMMAD,

Defendant-Appellant.

UNPUBLISHED
June 28, 2018

No. 339157
Ingham Circuit Court
LC No. 13-000161-FH

Before: CAMERON, P.J., and METER and BORRELLO, JJ.

PER CURIAM.

Defendant was convicted following a jury trial of first-degree home invasion, MCL 750.110a(2). The trial court sentenced defendant to 140 to 240 months' imprisonment with credit for 605 days served. Defendant now appeals as of right. For the reasons set forth in this opinion, we affirm defendant's conviction but remand this matter to the trial court for resentencing pursuant to the corrected sentencing guidelines range.

## I. BACKGROUND

This case arises out of an incident involving defendant and Krystal Muhammad that occurred on February 5, 2013, at Krystal's residence. Krystal testified at trial that she and defendant had been legally married since 2004 and were still married at the time of trial. However, Krystal testified that the last time they lived together on a regular basis was 2011 or 2012 and that they did not live together in 2013. At the time of the incident, she lived in an apartment in Lansing, Michigan. Krystal testified that defendant was not on the lease for the apartment, did not have a key to the apartment, did not have her permission to receive mail at the apartment, and did not regularly come and go from her apartment. Defendant lived in a different county, although Krystal did not know exactly where defendant lived.

According to Krystal, she allowed defendant to spend the night at her apartment on February 4, 2013, and defendant left the apartment at approximately 9:00 a.m. the next morning. Krystal subsequently left the apartment for a "few hours." When she returned, she noticed "duffle bags[] and grocery bags" on her porch. She took them inside, assuming that they belonged to a friend. She did not believe that they belonged to defendant. At some point, she discovered that the bags belonged to defendant and put them back outside because she did not want him in her home. Defendant returned to the apartment that evening.

-1-

Penny Pennoni, a letter carrier for the United States Postal Service, testified that she was delivering mail to Krystal's apartment at approximately 5:00 p.m. on February 5, 2013. She saw defendant on the porch knocking and "begging to be let in." Pennoni asked defendant to step aside so she could reach the mailbox. Defendant moved out of the way, and Pennoni began to put the mail in the mailbox. Pennoni testified that when she began to deliver the mail, Krystal opened the apartment door "[p]robably halfway," and defendant "rushed" at Krystal. According to Pennoni, defendant "grabbed" Krystal's neck with his left hand, hit Krystal in the face with his fist, and "kicked the door shut behind him." Pennoni further testified that defendant "nudged" the door with his shoulder when he tried to hit her.

Krystal testified, "I had just opened the door to get the mail and he came from the side of the building and pushed his way in." Krystal also testified that "[h]e pushed me to get in," that she "was halfway through the door," and that she did not give defendant permission to enter her apartment. Defendant pushed the door further open in order to enter. Krystal further testified that defendant pushed her, slammed the door closed, and then assaulted her. According to Krystal, defendant

> [g]rabbed me by my hair and threw me around the living room, and then at some point he got me on to the floor and was strangling me from behind in a wrestling choke hold.

Krystal explained that she "couldn't breathe" and "started to blackout and see[] stars." Krystal testified that defendant only stopped choking her after noticing the police lights and sirens. After he released her, the police knocked on the door and defendant answered the door.

Pennoni testified that after seeing defendant enter the apartment, she went back to her vehicle to call the police but discovered that her cell phone was dead. Then Pennoni went to the apartment manager's office to ask the manager to call the police.

Officer Rachel Bahl testified that she responded to Krystal's apartment that evening. When she arrived, the door was closed and there were plastic bags on the front porch that appeared to contain clothing. She listened at the apartment door and heard a man and woman arguing. Bahl knocked on the door, and defendant answered. According to Bahl, she asked him if everything was okay, and defendant responded that everything was fine and that Bahl was not needed. Bahl continued to speak with defendant and heard a woman yell from inside. The woman indicated that she had been assaulted and needed the police to come inside. Bahl went into the apartment, and she saw Krystal sitting on the couch. It appeared that Krystal was upset and had been crying, and at some point, Bahl noticed "red marks" around Krystal's throat. Bahl further testified that she saw signs that a struggle had occurred: there were items that appeared to have been knocked over onto the floor, and there were "drag marks in the carpeting." Bahl asked defendant what happened, and defendant indicated that he and his girlfriend had argued but that there had not been a physical assault. Defendant told Bahl that he entered the apartment without Krystal's permission when Krystal had opened the door for the mail carrier.

Officer Penni Elton testified that she also responded to Krystal's apartment that evening and that when she arrived, Bahl was inside the apartment speaking to Krystal and defendant. Elton spoke with defendant. Elton testified that defendant told her that once the apartment door

was opened, he "pushed his way inside so he could get some of his property." According to Elton, defendant told her that he lived in Port Huron. He later gave her a specific residential address that was located in Fort Gratiot, which is located close to Port Huron.

Defendant testified in his own defense, and he denied beating, choking, or grabbing Krystal. According to defendant, it took approximately four hours, traveling by a combination of train and taxi, to get from East Lansing to his residence in Fort Gratiot. Defendant referred to this residence as his "hideaway." Defendant testified that he and Krystal had reconciled before February 2013 and that they were living together at Krystal's apartment. On the morning of February 5, 2013, defendant donated plasma. He then bought two beers and drank them as he walked back to Krystal's apartment. He had "the keys" to enter the apartment because Krystal was still asleep. Once inside the apartment, defendant watched television and continued drinking. At some point, he and Krystal had some type of verbal disagreement, and defendant left the apartment. Defendant testified that Krystal texted him to tell him that his things were outside the apartment. He returned to get his things. Defendant testified that he received additional text messages from Krystal indicating that he should get his things and that he should not knock on the door. Defendant explained that when Krystal opened the door while the mail carrier was there, he thought that she had opened the door for him to enter because he had been living at the apartment and was her husband. According to defendant, Krystal did not tell him not to come inside, and he thought it was okay for him to enter when she opened the door. Defendant claimed that he had permission to enter the apartment because he had been living there since January 1.[1] Defendant also stated as follows:

> When she said, and don't knock on my door, I assumed she's going to open the door for me to come in because she knew I didn't have the keys. As I said, we have a marital relationship.

The jury found defendant guilty of first-degree home invasion and not guilty of assault with intent to do great bodily harm less than murder. The trial court sentenced defendant as previously noted. This appeal followed.

## II. CUSTODIAL INTERROGATION

On appeal, defendant first argues that the trial court erred by denying his motion to suppress statements that he made to the police without having received *Miranda*[2] warnings and permitting the statements to be introduced at trial. Specifically, defendant challenges the admission of statements that he made to Bahl on the night of the incident, which came in during Bahl's testimony. At trial, Bahl testified that after she entered the apartment, she asked defendant about what happened. According to Bahl, defendant responded that "he had come to the apartment to see his girlfriend," and "that they had gotten into an argument but there had been no physical assault." Bahl also testified that defendant told her that "he came in when the

---

[1] Defendant did not indicate a specific year, but it appears that he meant 2013.

[2] *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

mail lady—when the victim had opened up the door for the mail lady" and that "he had entered the apartment without her permission."

Before trial, defendant had moved to suppress the statements he made to the police that night arguing that the statements had been obtained in violation of *Miranda*. At the evidentiary hearing, Bahl testified that she responded to the apartment on the evening of the incident based on a report that there was a fight. She arrived alone. Bahl was in full uniform, and her firearm and Taser were visible. When Bahl approached the apartment, she heard yelling and heard Krystal telling defendant to leave. Bahl knocked on the door, and defendant answered. Bahl then heard Kyrstal yelling that she had been assaulted and wanted defendant to leave. Bahl testified that she entered the apartment and that defendant was not free to leave the area at that point because she was investigating a crime and another officer, Elton, was enroute to interview defendant. Once inside the apartment, Bahl saw Krystal crying on the couch, and Krystal indicated that defendant had choked her and dragged her on the floor. Bahl further testified that it was not her intention at that point to arrest defendant because she "hadn't interviewed him and gotten a statement from him yet as to what occurred, nor her."

According to Bahl, defendant made admissions to her while she was inside the apartment with both defendant and Krystal. Bahl never read defendant his *Miranda* rights. Bahl testified that defendant's statement "was an excited utterance by him" and that she "was not interviewing him at that time when he made that statement." Bahl explained during the following exchange:

> [*Bahl*]: Yes—prior—I'm sorry. Prior to Officer Elton's arrival they both were speaking to me at the same time telling me what had occurred. The statement that I put in my report there about him admitting to coming in is one of the things that he had admitted to me while I was standing there waiting for Officer Elton to arrive.

> *The Court*: And that's where you said you were merely investigating?

> [*Bahl*]: Correct.

> *The Court*: Later on you talk about custody and you then place him under arrest. That's after the statements are made?

> [*Bahl*]: Correct.

Bahl further testified that at this point, she did not know what had happened at the apartment that night and was trying to figure out what had occurred. She testified that she did not have probable cause to arrest anyone at this point. Bahl was not asking any questions at this point, and nobody had been placed under arrest or placed in handcuffs.

Bahl testified that Elton interviewed defendant when she arrived, that defendant was not free to leave at that point, and that defendant was also not in custody at that point. According to Bahl, Elton arrived "[m]aybe two minutes" after Bahl had arrived. Elton testified at the evidentiary hearing that defendant was not restrained and was not in custody when she arrived. Bahl further testified that defendant had not been told that he was not free to leave. Defendant

-4-

also had not been told that he was free to leave, and defendant never asked to leave. Bahl explained:

> He was being detained for an investigative purpose. He had not been advised that he was under arrest.

Bahl interviewed Krystal while Elton interviewed defendant. According to Bahl, both defendant and Krystal were being detained to determine who the victim was and whether there was probable cause that a crime had been committed. Bahl testified:

> [A]t the time of arrival both parties will want to say their halves, they'll want to get their statements across, they'll want to say whatever they can because the other person they want to go to jail is sitting next to them, and in order for me to get a true understanding of what occurred I need to separate the both of them, calm them down, and speak to them and get a statement from them, not just emotions and things that are coming out of them at the beginning—at the exact moment I arrived.

Elton testified that defendant was free to move around the apartment as she was speaking with him and that he could have left the apartment. At some point while Elton was interviewing defendant, Bahl told Elton to place defendant under arrest.

The trial court determined that there had been no *Miranda* violation and denied defendant's motion to suppress. The trial court concluded that Bahl was conducting an investigation to determine which party was the victim and which party was the aggressor. The trial court also concluded that defendant was only subject to a short investigatory detention, which may be justified by a reasonable suspicion of criminal activity.

"On appeal, the issue whether a person is in custody for purposes of *Miranda* is a mixed question of law and fact that must be answered independently after review de novo of the record." *People v Zahn*, 234 Mich App 438, 449; 594 NW2d 120 (1999). An appellate court "review[s] a trial court's factual findings in a ruling on a motion to suppress for clear error." *People v Elliott*, 494 Mich 292, 300; 833 NW2d 284 (2013) (quotation marks and citation omitted). "A finding is clearly erroneous if, after reviewing the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Coomer*, 245 Mich App 206, 219; 627 NW2d 612 (2001). "To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *Elliott*, 494 Mich at 300-301 (quotation marks and citation omitted). "Whether a court applied the correct constitutional standard is reviewed de novo." *Id*. at 301.

The trigger for the necessity of giving *Miranda* warnings is "custodial interrogation." *Zahn*, 234 Mich App at 449. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966); see also *Elliot*, 494 Mich at 305, quoting *Miranda*, 384 US at 444. Accordingly, *Miranda* warnings are required "only where there has been such a restriction on a

person's freedom as to render him 'in custody.' " *Stansbury v California*, 511 US 318, 322; 114 S Ct 1526; 128 L Ed 2d 293 (1994) (citation and some quotation marks omitted). "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id*. (quotation marks and citation omitted; alteration in original). The test is an objective one:

> As we have repeatedly emphasized, whether a suspect is "in custody" is an objective inquiry.
>
> > Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest. [*JDB v North Carolina*, 564 US 261, 270; 131 S Ct 2394; 180 L Ed 2d 310 (2011) (quotation marks and citation omitted).]

"[T]he subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *Id*. at 271 (quotation marks and citation omitted). Moreover, "[i]t is well settled . . . that a police officer's subjective view that the individual under questioning is a suspect, *if undisclosed*, does not bear upon the question whether the individual is in custody for purposes of *Miranda*." *Stansbury*, 511 US at 324 (emphasis added). In sum, we must consider "the totality of the circumstances" to determine "whether the accused reasonably could have believed that he was not free to leave," and our determination must be based on the objective circumstances rather than the subjective views of the individuals involved. *Zahn*, 234 Mich App at 449.

Brief detentions to investigate an officer's reasonable suspicion of criminal activity, commonly referred to as *Terry*-stops, are not ordinarily subject to the *Miranda* requirements. In *Berkemer v McCarty*, 468 US 420, 440; 104 S Ct 3138; 82 L Ed 2d 317 (1984), the United States Supreme Court held that persons temporarily detained as the result of ordinary traffic stops are not "in custody" for *Miranda* purposes. The *Berkemer* Court reasoned that typical traffic stops are "more analogous to a so-called 'Terry stop' . . . than to a formal arrest" because ordinary traffic stops, like *Terry* stops, are noncoercive and nonthreatening. *Id*. at 439-440, citing *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). The *Berkemer* Court explained that pursuant to *Terry* and its progeny, the Fourth Amendment permits "a policeman who lacks probable cause but whose observations lead him reasonably to suspect that a particular person has committed, is committing, or is about to commit a crime, [to] detain that person briefly in order to investigate the circumstances that provoke suspicion." *Berkemer*, 468 US at 439 (quotation marks and citation omitted). "[T]he stop and inquiry must be reasonably related in scope to the justification for their initiation," which typically means that "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id*. (quotation marks and citation

omitted; alteration in original). There is no obligation for the detainee to respond in this situation, and the detainee must be released following questioning if the officer does not develop probable cause to effectuate an arrest. *Id*. at 439-440. The United States Supreme Court noted that the "comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda." *Id*. at 440.

In concluding that a person subjected to an ordinary traffic was not in custody for purposes of *Miranda*, and analogizing such a stop to a *Terry* stop, the *Berkemer* Court reasoned that a typical traffic stop did not implicate the same risks to the privilege against self-incrimination that were at issue in *Miranda*. *Id*. at 437-439, 441-442. The *Berkemer* Court specifically noted that an ordinary traffic stop and any associated questioning is "presumptively temporary and brief" in contrast to the typically prolonged questioning involved in stationhouse interrogation. *Id*. at 437-438. The Court also noted that the atmosphere of a traffic stop is "substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in Miranda itself" because traffic stops occur in public and usually involve only one or two officers. *Id*. at 438-439 (citation omitted).

Relying on *Berkemer*, this Court has also held that a defendant was not in custody for *Miranda* purposes when an officer stopped the defendant's car to investigate the officer's suspicions that a controlled substance offense had been committed. *People v Steele*, 292 Mich App 308, 311, 317-319; 806 NW2d 753 (2011). In *Steele*, the officer had received information that the defendant was transporting materials necessary for manufacturing methamphetamine. *Id*. at 310-311. The officer stopped the defendant's car and, without providing *Miranda* warnings, asked the defendant questions about his controlled substance involvement. *Id*. at 311. Defendant made incriminating statements. *Id*. This Court concluded that there was no *Miranda* violation because the officer had justifiably conducted an investigative *Terry* stop and did not subject the defendant to custodial interrogation. *Id*. at 319. Specifically, this Court noted that it was permissible for the officer "to temporarily detain defendant and make a reasonable inquiry into possible criminal activity," that the officer's questions were minimal in number and were intended to gather information to confirm or dispel the officer's suspicions, that the defendant voluntarily answered the questions, and that the brief questioning was within the scope of the stop. *Id*.

In this case, defendant's statement was made during an interaction that, like the investigative traffic stops in *Berkemer* and *Steele*, was analogous to a *Terry* stop where *Miranda* warnings were not required. Bahl went to the apartment that evening to respond to reports of a fight, and she heard yelling when she arrived. She also heard Krystal yelling that she had been assaulted and wanted defendant to leave the premises. Bahl testified during the evidentiary hearing that when she first arrived, she did not know what had actually happened, and she was attempting to determine whether a crime had been committed and who the victim was. Defendant volunteered the statements at issue without specific prompting from Bahl. At the time defendant made these statements, Bahl was the only police officer in the apartment with defendant and Krystal. Furthermore, the statements were made during an approximately two-minute period of time between Bahl's arrival at the apartment and the arrival of Elton. Defendant also had not been placed under arrest at this point, and he had not been told that he was prohibited from leaving. Although Bahl testified that defendant was not free to leave before

he was interviewed, this subjective belief (which was never communicated to defendant) is irrelevant to the custody analysis for purposes of *Miranda*; instead the test is an objective one that focuses on whether a reasonable person would have felt free to leave. *JDB*, 564 US at 270-271; *Stansbury*, 511 US at 324; see also *Zahn*, 234 Mich App at 450 ("Because [the officer's] intention to prevent defendant from leaving the apartment was not conveyed to defendant, it could not have had any bearing on a defendant's understanding of the situation.").

It is apparent that under these circumstances, defendant was subjected at the very most to only a *brief* detention to allow Bahl to confirm or dispel her suspicions of criminal activity at the apartment that night. With Bahl being the only police officer present in the apartment with defendant and Krystal at the time defendant made these statements, there is no indication of a "police dominated," or otherwise unduly coercive environment. There is also no indication on this record that Bahl exceeded the scope of this brief investigatory detention aimed at discerning the circumstances that led to the report of a fight at the apartment. Therefore, we conclude that the instant situation was analogous to a *Terry* stop and that defendant was not "in custody" for *Miranda* purposes. *Berkemer*, 468 US at 437-440; *Steele*, 292 Mich App at 317-319. Because defendant was not in custody when he made these statements, *Miranda* warnings were not required and the trial court did not err by denying the motion to suppress. *Stansbury*, 511 US at 322; *Zahn*, 234 Mich App at 449.

## III. SUFFICIENCY OF THE EVIDENCE

Next, defendant challenges the sufficiency of the evidence supporting his conviction.

This Court "review[s] de novo a challenge to the sufficiency of the evidence." *People v Henry (After Remand)*, 305 Mich App 127, 142; 854 NW2d 114 (2014). "[W]hen determining whether sufficient evidence has been presented to sustain a conviction, a court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). "The sufficient evidence requirement is a part of every criminal defendant's due process rights," and "[i]t is an attempt to give 'concrete substance' to those rights, by precluding irrational jury verdicts." *Id*. at 514 (citation omitted).

The crime of first-degree home invasion is defined in MCL 750.110a(2), which provides as follows:

> (2) A person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling, a person who enters a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault is guilty of home invasion in the first degree if at any time while the person is entering, present in, or exiting the dwelling either of the following circumstances exists:

> (a) The person is armed with a dangerous weapon.

-8-

(b) Another person is lawfully present in the dwelling.

MCL 750.110a(1)(c) states that, for purposes of the home-invasion statute, "without permission" means "without having obtained permission to enter from the owner or lessee of the dwelling or from any other person lawfully in possession or control of the dwelling."

Accordingly, to secure a conviction for first-degree home invasion, the prosecution must prove the following elements:

(1) [T]he defendant either breaks and enters a dwelling or enters a dwelling without permission; (2) the defendant either intends when entering to commit a felony, larceny, or assault in the dwelling or at any time while entering, present in, or exiting the dwelling actually commits a felony, larceny, or assault; and (3) while the defendant is entering, present in, or exiting the dwelling, either (a) the defendant is armed with a dangerous weapon or (b) another person is lawfully present in the dwelling. [*People v Bush*, 315 Mich App 237, 244; 890 NW2d 370 (2016).]

"There is no breaking if the defendant had the right to enter the building." *People v Dunigan*, 299 Mich App 579, 583; 831 NW2d 243 (2013) (quotation marks and citation omitted). "[T]he fact that a person is in a dating relationship in no way entitles that person to be present in his or her partner's dwelling at will," and "[t]he fact that defendant spent some nights at the house is immaterial." *Id*.

In this case, defendant argues through appellate counsel that he could not have been convicted of first-degree home invasion because he had permission to be at the residence. Specifically, appellate counsel argues that defendant had permission to be in the apartment because he and Krystal were married, he had stayed there on previous days with permission, he had personal items at the residence, and he was not told that he could not enter the apartment on the day in question.

At trial, Krystal testified that defendant did not live with her in 2013. She further testified that defendant was not on the lease for her apartment, did not have a key to the apartment, did not have her permission to receive mail at the apartment, and did not regularly come and go from the apartment. Additionally, Elton testified that defendant told her on the night of the incident that he lived in Port Huron. Although Krystal allowed defendant to spend the night in the apartment on February 4, 2013, Krystal testified that defendant left the apartment the next morning and that she did not give him permission to enter the apartment when he returned that evening. In describing the incident, Krystal indicated that she had opened the door to get the mail, and defendant "pushed his way in." Pennoni testified that she saw defendant knocking on the door and "begging to be let in." She further testified that when Krystal opened the door, defendant "rushed" at Krystal and kicked the door shut after grabbing Krystal's neck and hitting Krystal in the face. Based on this evidence, the jury could have reasonably concluded that defendant did not have permission to enter the apartment on the evening of February 5, 2013.

Defendant testified in contrast that he had been living at the apartment, had permission to enter the apartment, and believed that Krystal opened the door for him to enter. However, when reviewing a challenge to the sufficiency of the evidence, we resolve all evidentiary conflicts in favor of the prosecution, and we "do not interfere with the jury's assessment of the weight and credibility of witnesses or the evidence." *Dunigan*, 299 Mich App at 582. Moreover, defendant did not have some type of automatic right to enter the apartment as a result of his relationship with Krystal or the fact that he may have sometimes spent the night at the apartment. See *id*. at 583. There is no merit to defendant's argument that relies on his status as Krystal's legal husband because a spouse with no legal right to enter the marital home may properly be charged with breaking and entering the home; his entry under such circumstances constitutes a violation of the possessory interest of the other spouse. *People v Szpara*, 196 Mich App 270, 273-274; 492 NW2d 804 (1992). In this case, Krystal testified that defendant's name was not on the lease, that he did not live with her, and that he did not have a key to the apartment. A jury could therefore have reasonably concluded that Krystal's apartment was not the marital home and that defendant did not reside at the property or have some kind of legal right to be in the apartment.

Therefore, viewing the evidence in a light most favorable to the prosecution, the jury could have reasonably found beyond a reasonable doubt that defendant entered the apartment without permission and that the first element was satisfied. *Bush*, 315 Mich App at 244.

In his Standard 4 brief, defendant additionally challenges the assault element of his first-degree home invasion conviction. Defendant argues that the charge of assault with intent to do great bodily harm constituted the predicate "assault" for purposes of the first-degree home invasion charge and that he necessarily cannot be guilty of first-degree home invasion because the jury acquitted him of assault with intent to do great bodily harm. Defendant also argues that a felony assault offense must serve as a predicate offense to support a first-degree home invasion conviction and that he was not charged with any other type of assault that would have provided him sufficient notice to adequately make his defense.

As an initial matter, it does not appear that the assault with intent to do great bodily harm charge was actually the predicate offense relied on to support the charge and conviction of first-degree home invasion. Defendant was charged in separate counts with first-degree home invasion and assault with intent to commit great bodily harm. However, in describing the first-degree home invasion charge, the information alleged that defendant "did commit an *assault*" while entering, present in, or exiting the dwelling. (Emphasis added.) Furthermore, at both the beginning and end of defendant's trial, the jury was instructed with respect to the first-degree home invasion charge that the prosecution was required to prove that defendant "committed the offense of assault" when he entered, was present in, or was leaving the dwelling. During the final jury instructions at the end of trial, the trial court further instructed the jury that for purposes of the first-degree home invasion charge, "assault means either attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery." The trial court continued by defining a battery as "a forceful, violent, or offensive touching" that was "intended by defendant."

This Court has previously explained that for purposes of the first-degree home invasion statute, the definition of the term "assault" is provided by the common law. *People v Musser*, 259 Mich App 215, 222-223; 673 NW2d 800 (2003). In Michigan, the term "assault" is defined

as "either an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery." *Id*. at 223 (quotation marks and citation omitted). "[A] battery is the successful accomplishment of an attempted-battery assault," and "[i]t is impossible to commit a battery without first committing an attempted-battery assault." *People v Nickens*, 470 Mich 622, 628; 685 NW2d 657 (2004). "[A] battery is an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person." *Id*. (quotation marks and citation omitted). Moreover and contrary to defendant's argument, the first-degree home invasion statute does not require that the predicate assault offense be some type of felony assault. We have previously explained that "[i]t is clear that 'assault' under MCL 750.110a(2) refers to both misdemeanors and felonies" and that "Subsection 110a(2) does not limit the term 'assault' to any particular type of assault." *People v Sands*, 261 Mich App 158, 163; 680 NW2d 500 (2004).

In this case, there was testimony that defendant "rushed" at Krystal when she opened the apartment door, pushed his way inside without her permission, grabbed her neck, and hit her in the face. Krystal testified that defendant grabbed her by the hair, "threw" her around the living room, and strangled her from behind in a "wrestling choke hold." Krystal further testified that she was unable to breathe and started to blackout. Therefore, viewing the evidence in a light most favorable to the prosecution, the jury could have reasonably found that defendant actually committed an attempted-battery assault while entering or present in the apartment and that the prosecution therefore proved the second element of first-degree home invasion beyond a reasonable doubt. *Nickens*, 470 Mich at 628; *Musser*, 259 Mich App at 222-223; *Sands*, 261 Mich App at 163; *Bush*, 315 Mich App at 244.

Furthermore, defendant had adequate notice to defend against the first-degree home invasion charge because the information alleged that he committed an "assault" (not the specific offense of assault with intent to do great bodily harm) while entering, present in, or exiting the dwelling. Although due process for a criminal defendant "generally requires reasonable notice of the charge and an opportunity to be heard," this constitutional requirement "is not an abstract legal technicality; it is a practical requirement that gives effect to a defendant's right to know and respond to the charges against him." *People v McGee*, 258 Mich App 683, 699-700; 672 NW2d 191, 201 (2003) (quotation marks and citation omitted). In this case, the first-degree home invasion count in the information reasonably apprised defendant of the nature of the charge against him. *Id*. Defendant cites no authority for the proposition that the underlying assault for purposes of a first-degree home invasion offense is somehow limited only to any specific type of assault that the prosecutor may have chosen to charge in an additional count. Accordingly, any such argument is abandoned because "[a]n appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Green*, 313 Mich App 526, 535; 884 NW2d 838 (2015) (quotation marks and citation omitted).

To the extent that the assault with intent to do great bodily harm charge could be understood to constitute a predicate offense for purposes of the first-degree home invasion conviction, the mere fact that the jury acquitted defendant of assault with intent to do great bodily harm does not compel the conclusion that defendant could not have been found guilty of first-degree home invasion. The fact that a jury renders inconsistent verdicts, one of which is an acquittal, does not require reversal of the conviction; there is no requirement that jury verdicts be

logically consistent. *People v Vaughn*, 409 Mich 463, 464-466; 295 NW2d 354 (1980). In other words, "[j]uries are not held to any rules of logic nor are they required to explain their decisions." *Id*. at 466. "Since we are unable to know just how the jury reached their conclusion, whether the result of compassion or compromise, it is unrealistic to believe that a jury would intend that an acquittal on one count and conviction on another would serve as the reason for defendant's release." *Id*.

Nonetheless, the jury's verdicts in this case were not necessarily inconsistent. The elements of assault with intent to do great bodily harm less than murder are: "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Parcha*, 227 Mich App 236, 239; 575 NW2d 316 (1997). "Intent to do great bodily harm is intent to do serious injury of an aggravated nature." *People v Russell*, 297 Mich App 707, 721; 825 NW2d 623 (2012). Thus, by finding defendant guilty of first-degree home invasion and not guilty of assault with intent to do great bodily harm, the jury may have simply found that defendant committed an assault but without the intent to do great bodily harm.

In sum, defendant has not demonstrated that there was insufficient evidence to support his conviction.[3]

## IV. OTHER-ACTS EVIDENCE

Next, defendant argues through appellate counsel that the trial court erred by admitting other-acts evidence without a proper purpose and contrary to MRE 404(b)(1). Defendant further argues that the evidence was also improperly admitted without the notice required under MRE 404(b)(2).

During defendant's[4] cross-examination of Krystal, defendant elicited testimony from Krystal that she had "Severe brain trauma" and that her memory was "not perfect." Following the prosecutor's redirect examination of Krystal, the trial court asked Krystal a question that was submitted by the jury. The following exchange occurred, which contains the statements now challenged by defendant on appeal:

> *The Court*: The question, Krystal, is this, do you have a medical diagnosis documenting the severe brain trama [sic] that you mentioned? Have you seen doctors?
>
> *The Witness*: I have seen doctors, Your Honor.

---

[3] We note that the jury also could have reasonably found that the prosecution proved beyond a reasonable doubt the third element, which may be satisfied by the lawful presence of another person (Krystal) in the dwelling while the defendant is entering, present in, or exiting the dwelling. *Bush*, 315 Mich App at 244.

[4] Defendant represented himself at trial.

*The Court*: Is there a diagnosis that you can tell us?

*The Witness*: Just PTSD and other—

*The Court*: PTSD.

*The Witness*: That would be the only one pertaining to [defendant], yes. That's it.

*The Court*: Okay. And how does that affect your memory?

*The Witness*: I have lost a lot of memory over the years from assaults by [defendant].

[*Defendant*]: Objection, Your Honor.

*The Court*: Sir.

[*Defendant*]: Yes.

*The Court*: What is your objection?

[*Defendant*]: My objection is that there's nothing in the testimony that factually says anything about any other assaults. Nothing. She has—she's been testifying since February 2013 and not once have another assault come up so why today conveniently?

*The Court*: Overruled. Ma'am, so you have talked to doctors?

*The Witness*: Yes.

*The Court*: And what have you stated to doctors? If we were to bring your medical testimony, you have medical documentation that indicates that there have been other incidents?

*The Witness*: Yes.

*The Court*: And as a result you've been diagnosed with post traumatic [sic] stress disorder?

*The Witness*: Correct.

*The Court*: And what kind of doctors have you seen?

*The Witness*: I've seen psychiatrist, therapists, my regular physician.

*The Court*: And are you still in treatment?

*The Witness*: Yes.

*The Court*: Okay. And how does the post traumatic [sic] stress disorder affect your memory?

*The Witness*: I don't seem to remember a lot of things anymore. You could ask me what I ate for dinner two days ago and I wouldn't be able to tell you.

*The Court*: So does it affect short term memory, long term memory, or both?

*The Witness*: Both.

Shortly after this questioning, a side-bar was held, and the trial court instructed the jury as follows:

> You are to base your decision only on count one and count two and nothing that you've heard as far as any allegations or charges that defendant may have had in the past, because he's only on trial here as alleged in count one and two, so anything else that you may think has gone on in the past is not relevant to this proceeding. You cannot consider at all in your deliberations. Not at all, can't weigh in, can't discuss it. Doesn't fit in here and there will be an instruction in detail at the end.

During final jury instructions, the trial court instructed the jury "not to consider as evidence in this trial any comments with regard to defendant's alleged past criminal history."

## A. ISSUE PRESERVATION

Although defendant objected after Krystal's answer, we do not understand defendant's general objection to her testimonial statement as one that was premised on MRE 404(b) grounds. There is no reference in defendant's trial objection to MRE 404(b) or "other-acts evidence," as that term of art is understood in the 404(b) context. Defendant did not assert that the evidence was being introduced for an improper purpose. Instead, defendant's objection seems to have been premised on his contention that Krystal's statement was somehow factually inconsistent with her previous testimony. But defendant's appellate challenge to the statement's admissibility is premised on MRE 404(b). "An objection based on one ground at trial is insufficient to preserve an appellate attack based on a different ground." *People v Stimage*, 202 Mich App 28, 30; 507 NW2d 778 (1993). Therefore, this issue is unpreserved. *Id.*

## B. STANDARD OF REVIEW

We review unpreserved issues for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). On plain-error review, the defendant has the burden to show (1) "error"; (2) that was "plain," meaning "clear or obvious"; (3) and that affected substantial rights or caused prejudice, meaning "that the error affected the outcome of the lower court proceedings." *Id.* at 763. "[O]nce a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse," but "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent

-14-

defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (citation and quotation marks omitted; last alteration in original).

## C. ANALYSIS

MRE 404(b)(1) provides as follows:

> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

We begin our analysis of this issue by noting that the testimony about defendant's alleged prior assaults was not intentionally elicited by the prosecution or the trial court. Rather, Krystal's statement regarding defendant's prior assaults was unresponsive to the trial court's question regarding how Krystal's PTSD affected her memory. Krystal's isolated and unresponsive statement did not by itself constitute the introduction into defendant's trial of a prejudicial error requiring reversal. See *People v Mahone*, 294 Mich App 208, 213; 816 NW2d 436 (2011) ("In any event, unresponsive answers may " 'work a certain amount of mischief with the jury,' " but they are generally not considered prejudicial errors unless egregious or not amenable to a curative instruction.") (citation omitted); see also *People v Gonzales*, 193 Mich App 263, 266-267; 483 NW2d 458 (1992) (explaining that "an unresponsive, volunteered answer to a proper question is not cause for granting a mistrial," which should only be granted in situations "where the error complained of is so egregious that the prejudicial effect can be removed in no other way") (quotation marks and citation omitted).

Furthermore, the trial court's subsequent questioning was clearly focused on exploring the quality of Krystal's memory, which was a pertinent consideration in light of the importance of her eyewitness testimony as the victim of the home invasion. The trial court did not focus on defendant's alleged prior assaults or seek to elicit details about those incidents from Krystal, although one of the trial court's questions did inquire whether there was medical documentation of "other incidents." Nonetheless, assuming without deciding that this could be considered the solicitation of improper other-acts evidence under MRE 404(b)(1), defendant has not demonstrated error requiring reversal because there was no prejudice. The trial court promptly gave a curative instruction to the jury, which made clear that the jury was not to consider any allegations of past improper conduct by defendant in reaching its verdict. An additional instruction reiterating this point was given during final jury instructions. "Jurors are presumed to follow their instructions, and it is presumed that instructions cure most errors." *Mahone*, 294 Mich App at 212.

Finally, the prosecution did not intend to introduce the statements regarding defendant's alleged prior assaults and therefore did not violate the notice requirement regarding other-acts

evidence. MRE 404(b)(2) (requiring the "prosecution" to provide notice of other-acts evidence "it intends to introduce at trial").

## V. JURY INSTRUCTIONS

Next, defendant argues that the trial court erred by instructing the jury that it could find defendant "guilty of both or either of these crimes or not guilty of either of these."

Defendant has waived this issue. Waiver is "the intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citation omitted). Expressing approval of a trial court's course of action constitutes a waiver of an appellate challenge to that action. *Id.* at 220.

In this case, the parties reviewed the jury instructions on the record and discussed M Crim JI 3.20, which concerns a single defendant charged with multiple counts. Defendant stated that he thought this standard jury instruction "was a little one-sided." The trial court indicated that it would instruct the jury that it "may find defendant guilty of both or either of these crimes or not guilty of either of these." Defendant responded, "Thank you." Following other discussion, the trial court asked if there were any other changes to the jury instructions. Defendant stated, "None for the defense, Your Honor, thank you." After reading the final instructions to the jury, the trial court asked defendant if he was "satisfied with the reading of the jury instructions." Defendant responded, "Yes, ma'am, Your Honor, thank you." Therefore, defendant waived his challenge to the jury instruction by expressly approving of the specific instruction. "One who waives his rights . . . may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *Carter*, 462 Mich at 215 (quotation marks and citation omitted).

## VI. SENTENCING

Next, defendant argues that he should be resentenced because 10 points were improperly assessed for Offense Variable 4 (OV 4). Defendant argues that there was no evidence that Krystal suffered a serious psychological injury requiring professional treatment as a result of the home invasion in this case and that the trial court therefore could not permissibly assess 10 points for OV 4.

Defendant preserved this issue for appeal by raising it at sentencing. MCL 769.34(10). We review de novo as questions of law the interpretation and application of the legislative sentencing guidelines. *People v McGraw*, 484 Mich 120, 123; 771 NW2d 655 (2009). "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013) (citation omitted).

The instructions for scoring OV 4 are found in MCL 777.34, which provides:

(1) Offense variable 4 is psychological injury to a victim. Score offense variable 4 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

(a) Serious psychological injury requiring professional treatment occurred to a victim ……………………………………………………………………. 10 points

(b) No serious psychological injury requiring professional treatment occurred to a victim …………………………………………………………… 0 points

(2) Score 10 points if the serious psychological injury may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive.

It is proper to assess 10 points when the victim's "serious psychological injury may require professional treatment." MCL 777.34(2); *People v Lockett*, 295 Mich App 165, 182-183; 814 NW2d 295 (2012). "There must be some evidence of psychological injury on the record to justify a 10–point score." *Lockett*, 295 Mich App at 183. "[A] trial court 'may not simply assume that someone in the victim's position would have suffered psychological harm because MCL 777.34 requires that serious psychological injury *"occurred* to a victim," ' not that a *reasonable* person in that situation would have suffered a 'serious psychological injury.' " *People v White*, 501 Mich 160, 163; 905 NW2d 228 (2017) (citation omitted). "[E]vidence of fear while a crime is being committed, *by itself*, is insufficient to assess points for OV 4." *Id*. at 162.

Furthermore, and as particularly pertinent in the instant appeal, "[o]ffense variables are properly scored by reference only to the sentencing offense except when the language of a particular offense variable statute specifically provides otherwise." *McGraw*, 484 Mich at 135. The *McGraw* Court defined "sentencing offense" as "the crime of which the defendant has been convicted and for which he or she is being sentenced." *Id*. at 122 n 3. The *McGraw* Court described this scoring approach as one that is "offense-specific," under which "only conduct occurring during the offense of which the defendant was convicted may be considered." *Id*. at 124. In other words, "unless stated otherwise, only conduct that relates to the offense being scored may be considered" when determining the score for an offense variable. *People v Sargent*, 481 Mich 346, 350; 750 NW2d 161 (2008).

In this case, the trial court indicated that it was assessing 10 points for OV 4 based on Krystal's testimony that she had psychological and PTSD issues for which she had sought treatment. As previously noted, Krystal testified at trial that she had PTSD "pertaining to [defendant]" and that she had "lost a lot of memory over the years from assaults by [defendant]." There was no victim's impact statement in the presentence investigation report.

Although it is conceivable that Krystal's testimony could include the assault committed by defendant as part of the home invasion, it clearly refers to multiple assaults committed over the course of a period of years. There is no specific nexus between the sentencing offense in this case—i.e., the first-degree home invasion that occurred on February 5, 2013—and Krystal's general, vague statement regarding PTSD that resulted from years of being assaulted by

defendant. The alleged prior assaults were completely unconnected to the events of February 5, 2013. Moreover, it is impossible to tell from her testimony whether Krystal had been diagnosed with PTSD before February 5, 2013 or whether the home invasion that defendant committed that night had any influence on Krystal's PTSD. In short, based on the current record, any connection between Krystal's PTSD and the sentencing offense is purely conjectural. There is no language in the OV 4 statute specifically permitting reference to conduct outside the sentencing offense. MCL 777.34; *McGraw*, 484 Mich at 135. Accordingly, the trial court erred by considering conduct that was unrelated to the sentencing offense in determining the number of points to assess for OV 4. *McGraw*, 484 Mich at 124; *Sargent*, 481 Mich at 350. Furthermore, the prosecution argues on appeal that we should consider the testimony of "the police officers," without providing any more specific description of this testimony, in order to determine that psychological harm occurred. Presumably, the prosecution intends to refer to the testimony that Krystal appeared upset and was crying that night. However, such behavior is also consistent with *physical* injury. Courts are not permitted to simply assume that *psychological* injury occurred. *White*, 501 Mich at 163. The trial court erred by assessing 10 points for OV 4 in this case.

Defendant was sentenced to 140 to 240 months' imprisonment pursuant to a minimum guidelines range of 84 to 140 months. But assessing zero points for OV 4 rather than 10 points results in lowering defendant's total OV score from 30 points to 20 points, which reduces defendant from OV Level II to OV Level III on the Class B sentencing grid. MCL 777.16f; MCL 777.63. As a result, defendant's corrected minimum guidelines range is 78 to 130 months. MCL 777.63. Accordingly, the scoring error altered the appropriate guidelines range, and defendant is therefore entitled to be resentenced. *People v Francisco*, 474 Mich 82, 89-91; 711 NW2d 44 (2006).

## VI. REMAINING STANDARD 4 ISSUES

Finally, defendant argues in his Standard 4 brief that the jury's guilty verdict was influenced by "extraneous considerations." Defendant's argument is premised primarily on his assertion that the trial court instructed the jury to presume him guilty. Defendant cites what is clearly a misstatement by the trial court during the course of reading the final jury instructions. The trial court stated:

> A person accused of a crime is presumed to be innocent. This means that you must start with the presumption that defendant is guilty. This presumption continues throughout the trial and entitles defendant to a verdict of not guilty unless you are satisfied beyond a reasonable doubt that defendant is guilty.

Clearly, the jury is not to start with a presumption that defendant is "guilty." However, while "[a] criminal defendant is entitled to have a properly instructed jury consider the evidence against him," *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002), we also "review jury instructions in their entirety to determine if error requiring reversal occurred," *People v Aldrich*, 246 Mich App 101, 124; 631 NW2d 67 (2001). "Even if the instructions are somewhat imperfect, reversal is not required as long as they fairly presented the issues to be tried and sufficiently protected the defendant's rights." *Id*. In this case, considering misstatement in the context of the surrounding instructions, we conclude that the trial court fairly presented to the

jury the concept that a defendant is presumed innocent unless the jury concludes beyond a reasonable doubt that the defendant is guilty. *Id*. On the whole, we find no error. Moreover, as previously noted, defendant expressed his satisfaction with the reading of the jury instructions at trial and therefore waived any claim of error on this ground. *Carter*, 462 Mich at 215, 220.

Next, defendant makes a host of assertions regarding alleged racial, religious, and judicial bias. However, defendant does not cite any relevant legal authority regarding these issues, nor does he provide any cogent explanations of how his perceived injustices amounted to legally reversible error. Essentially, defendant appears to argue that the only explanation for his conviction is that he was subjected to bias and unfair treatment. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *Green*, 313 Mich App at 535 (quotation marks and citation omitted). Therefore, we conclude that these remaining arguments are abandoned. *Id*.

We affirm defendant's conviction but remand for resentencing consistent with this opinion. We do not retain jurisdiction.


/s/ Thomas C. Cameron
/s/ Patrick M. Meter
/s/ Stephen L. Borrello

-19-